EVERS, J.T.C.
The threshold issue in this local property tax case involves a valuation approach which has resulted from the widespread conversion of rental apartment buildings to condominium and/or cooperative ownership. In its quest for a reduction in the assessments levied against its 216-unit garden apartment *394 complex in 1979, 1980 and 1981 taxpayer relied on the capitalization of income approach to value. Borough utilized the income and cost approaches and a market approach based on a conversion value theory. The crux of borough’s theory is, notwithstanding that the subject as of all assessing dates was a rental property, a prudent investor would purchase the property for an amount in excess of the value developed through the traditional valuation approaches. It claims that the climate of the market created additional “anticipated use” value. While it will be necessary to resolve the many other issues involved in this complex matter the analysis must first commence with a review of the multi-family housing market in general and of the market area in which the subject premises are located in particular. That analysis begins with a description of the premises and its assessment and conversion history.
The subject site, which is identified as Block 2, Lot 1A on the borough assessment list, consists of a generally rectangularly shaped parcel containing 5.55 acres and having 400 feet frontage on Liberty Street. It conforms to the requirements of the multi-family zone in which it is located. All utilities necessary for its present use are available and in service. The site is located in the extreme northerly part of Little Ferry and is adjacent to the boundary lines of Hackensack and South Hackensack. Although primarily residential in nature the immediate area consists of mixed uses including a cemetery and some commercial uses. Liberty Street is a fairly well-travelled artery.
The site is improved with six two-story and basement garden apartment buildings, each containing 36 units, and a two-story office and garage structure, all being constructed in 1971. The buildings have brick veneer on the exterior, gable roofs with asphalt shingle roofing, aluminum windows and aluminum gutters and leaders. There are 195 one-bedroom/one-bathroom and 21 two-bedroom/two-bathroom units, all of which have relatively modern kitchens containing an electric range and oven, refrigerator, freezer, dishwasher and indoor/outdoor carpeting. All apartments are electrically heated and air-condi *395 tioned. The one-bedroom units contain 676 square feet and the two-bedroom units 1,076 square feet exclusive of balconies found in the second-floor units and patios in the first-floor units. The buildings have common hallways and each contains three laundry rooms. A swimming pool is located in the center courtyard. Adequate paved parking areas exist on the site. The property is attractively landscaped and obviously, based on the testimony and photographs, is well maintained and in good condition. A picture of an above-average garden apartment complex is presented.
As of the critical assessing dates, (October 1, 1978, 1979 and 1980) the property was operated entirely on a rental basis. During all three years the vacancies averaged .017%. Also, during all three years the rents were controlled by ordinance which, on balance, as characterized by borough’s witness, was somewhat liberal. The ordinance, which was first adopted in 1977, allowed for annual rent increases based on the Consumer Price Index with a maximum increase of ten% annually. Tax increases, in addition to the ten% maximum rent increase, were permitted to be passed through to the tenants in 1978 but for 1979 and 1980 both tax and rent increases were subject to the ten% cap. The ordinance also provided for capital improvement, hardship increases and vacancy decontrol.
On June 11, 1981, pursuant to a contract entered into in February 1981, taxpayer filed an offering statement and plan with the borough and State to convert the complex to condominium ownership. The 216 units were offered at a total price of $12,826,400. The property was conveyed by taxpayer to the condominium converter by deed dated February 18, 1982 for a consideration of $10,983,816.
Relying exclusively on the capitalization of income approach taxpayer estimated the value range of the property to be $4,013,000 to $4,339,900. Using all approaches borough concluded, based on an opinion that the highest and best use is for multi-family residential development in condominium ownership, that the value was between the value produced by the *396 income and conversion value approaches. Borough’s witness found those values to range from $5,000,000 in 1979 to $6,000,-000 in 1981. The assessment for all three years was $4,957,500. In 1979 the Bergen County Board of Taxation entered judgment reducing the assessment to $4,073,100 from which borough appealed and taxpayer counterclaimed. Direct appeals were filed by taxpayer in 1980 and 1981.
The value for conversion, or anticipated use theory, was first tested in Bergen County in Center-Whiteman Corp. v. Fort Lee, 4 N.J.Tax 153 (Tax Ct.1982).[1] There, after stressing that its decision was limited to the facts in that record, the court said;
This decision, while standing for the approval of the “anticipated use approach” in cases of vertical subdivisions, points out that this approach is rife with uncertainties from an appraiser’s point of view. See, generally, Sub-Division Analysis—An Educational Memo, American Institute of Real Estate Appraisers (1978). In any event, the approach does have merit as long as certain critical facts are established. In particular, it must be preliminarily established that the market is indeed ripe for such vertical subdivisions. Stated differently, it must be demonstrated, by a fair preponderance of the evidence, that a typical investor would consider the development of real estate in that manner. In this case the borough has done so but yet has failed to adduce substantial credible evidence of the market value of the subject property pursuant to this method, [at 171-172]
Thus, for borough to prevail on the basis of its conversion approach, it is clear that it must, by a preponderance of the evidence show (1) the existence of a conversion market, (2) that, as viewed by the typical investor, the subject is ripe for conversion, and (3) the market value of the property pursuant to that method of valuation. Before discussing those points, because borough’s testimony concerning its conversion value theory was objected to by taxpayer, that objection will be addressed. Taxpayer claims that because, as of the three assessing dates, the property was being operated on a rental basis any testimony directed to conversions is inadmissible. Taxpayer relies on *397 Sage v. Bernards Tp., 5 N.J.Tax 52 (Tax Ct.1982), aff'd 6 N.J.Tax 349 (App.Div.1984), certif. den. 97 N.J. 581, 483 A.2d 125 (1984), in which it was said that property should be valued for tax assessment purposes upon what was known and reasonably anticipated as of the assessing date and not upon speculation or conjecture. Taxpayer asserts that because the property had not, in fact, been converted during the period under review it must be valued by the capitalization of income approach, whieh approach is most often relied on with respect to investment properties. A close reading of Sage v. Bernards Tp., however discloses that it is of no assistance to taxpayer’s position because the court, although attributing no weight to it because of its many contingencies and unusual terms, did admit into evidence a contract of sale of the subject property executed 17 days after the assessing date.
In New Brunswick v. Tax Appeals Div., 39 N.J. 537, 189 A.2d 702 (1963), in considering diminished rental income subsequent to the assessment date, Chief Justice Weintraub stated that, “valuation, although based upon a forecast of earnings, must be found upon what was known and anticipated as of the assessing date, unaided by hindsight.” Id. at 545, 189 A.2d 702. While an unduly strict interpretation of that language would seemingly rule out consideration of all events occurring subsequent to the critical assessment date, the interpretation employed by Judge Andrew in Almax Builders, Inc. v. Perth Amboy, 1 N.J.Tax 31 (Tax Ct.1980) is more reasonable and logical. He stated:
So long as a proffered sale is not remote, the sale should be admitted for its rational probative valuation inference. This court is constrained to conclude that a strict interpretation of the language in New Brunswick v. Tax Appeals, supra, 39 N.J. 537, [189 A.2d 702] is not controlling on the issue involved herein since the case did not concern sales after a valuation date but rather diminished rental incomes subsequent to an assessment date. One cannot deny the logic of the equal rational probative value of a sale which occurs one day after the assessment date compared to its occurrence one day prior to such date. Appraisal experts are capable of making adjustments for time. As a matter of appraisal theory, adjustments must be made for time in any event in order to render a comparable sale an indication of value for the property under consideration. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978), 281 [at 37-38]
*398 Judge Andrew's interpretation in Almax is apparently a restatement of the law of D., L. & W.R.R. Co. v. Hoboken, 16 N.J.Super. 543, 85 A.2d 200 (App.Div.1951), rev’d on other grounds, 10 N.J. 418, 91 A.2d 739 (1952) which stands for the proposition that a local assessor has the authority to use his knowledge and judgment in valuing post-assessment events which are relevant. In L. Bamberger & Co. v. Tax Appeals Div., 1 N.J. 151, 62 A.2d 389 (1948) the issue in question involved the probative weight to be given to a sale of the subject property. The assessment dates involved were October 1, 1944 and 1945. The property was sold in December 1945, which was 15 months and three months after the respective assessing dates. The Court was clearly aware of the dates involved, as it was noted in the opinion that the sale was “subsequent, as will be observed, to the assessing dates.” Id. at 153, 62 A.2d 389. There was no question in that matter that the sale was admissible in evidence, the only issue being the weight to be accorded to the transaction.[2] See Venino v. Carlstadt, 1 N.J.Tax 172 (Tax Ct.1980), aff’d 4 N.J.Tax 528 (App.Div.1981), where a sale which took place two and one-half years after an assessment date was relied on.
Based on the foregoing I conclude that unless a subsequent event is clearly barred by considerations such as remoteness in time or location, or is virtually totally dissimilar to the property in question, the mere fact that it took place subsequent to the assessment date should not bar it from consideration in the valuation process.
Turning to the question of whether a conversion market existed during the period in question I note at the outset that Little Ferry is a south Bergen County community which is surrounded by the very similar and relatively small communities of South Hackensack, Teterboro, Moonachie, Ridgefield and Ridgefield Park. A notable exception is the larger City of *399 Hackensack which serves as the county seat and which abuts Little Ferry on the north. In close proximity are the Meadow-lands communities of Bergen and Hudson Counties. By virtue of the network of major highways in or about the borough it is but a short distance in terms of both time and location from the Hudson River communities of Fort Lee, Palisades Park, Cliff-side Park and Edgewater and from New York City itself. Typical of most of Bergen County’s 70 communities, except for signs so advising the motorist or pedestrian, it is often difficult to determine when one is leaving or entering a particular community. In fact, Liberty Street, a main thoroughfare on which the subject is located, is also a major artery that traverses Hackensack, Moonachie, Carlstadt and East Rutherford. Nestled within one of the most populous areas in the state, Little Ferry is also in close proximity to major commercial and industrial centers and markets for all the necessities and luxuries of life. As such it is not impervious to the many demands of the citizenry, in and out-of-State, including demands for housing of all types; permanent and transient, rented and owned, attached and detached, and highrise, lowrise or garden apartment structures. The borough’s location and the mere existence of such needs and demands however does not lead inescapably to the conclusion that, as viewed by a typical and prudent investor, there existed at all times in question a demand to convert an obviously successfully operated rental complex to 216 privately-owned apartment units.
The testimony of borough’s expert witness in support of his value for conversion theory showed a detailed picture of the multi-family housing market in Bergen and Hudson Counties. He traced the penetration of condominiums and cooperatives into the Bergen-Hudson market from the early 1970s in Fort Lee and Hackensack through the construction of the imposingly large Winston Tower project in Cliffside Park to the newly constructed (June 1981) Admirals Walk condominium located below the Palisades on the Hudson River in Edgewater and finally to the conversion of the subject property itself. During that period his study indicated that 10,352 units were constructed or converted to condominium/cooperative ownership in Ber *400 gen County and almost 2,000 units in nearby Hudson County communities. The study showed that at the conclusion of that period the conversion activity took place in a broad cross-section of the county; in the smaller quiet-like boroughs of Midland Park and Ramsey to the larger commercial-type communities of Fort Lee and Hackensack and involved all types of projects from highrise structures to four-family houses; from immediate post-World War II government subsidized projects to luxurious buildings.[3]
Concerning Little Ferry, while acknowledging that the subject property was the sole conversion, the expert stated that conversions in the nearby communities of Lodi, North Arlington, Rutherford and even in parts of Hackensack support his opinion that the borough is in the geographical conversion market. In Sunshine Biscuits, Inc. v. Sayreville, 4 N.J.Tax 486 (Tax Ct.1982), Judge Andrew said:
While it is generally true that sales of comparable facilities should not be too remote in location from the subject property, the process of comparison must be based on sales that reflect typical market action within the market in which the property would be sold. American Institute for Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978), 274-275. The market for a particular parcel of real estate consists of the potential purchasers, unlimited by a specific geographical location. Ibid. The effectiveness of comparable sales which are some distance from the subject depends, in large part, upon the nature and character of the property involved, [at 496],
The evidence clearly suggests that there was a market for sales of condominium and cooperative units which, as of 1981, *401 probably included the Little Ferry area. The number of sold units is seemingly overwhelming; the conversions apparently knew no bounds in terms of specific communities, areas, or types of housing. We are thus confronted with the question of whether the subject was ripe for conversion as of the assessing dates, or any one of them, so as to induce an investor to pay a premium for conversion value.
A close review of the conversion market study for the period ending with the conversion of the subject property in 1981[4] produces certain interesting results. Although 10,352 units were either constructed or converted in Bergen County during that period 8,000 units or almost 80% were created in 1979 and thereafter. Therefore, while the market may have had its beginnings in 1971 with the conversion of the Mary Crest Apartments in Fort Lee, it appears that only about 20% of the condominium/cooperative units came into being between 1971 and 1978. It is also interesting to note that of the 2,352 units created during that eight-year period all but approximately 200 were located in the Hudson River communities of Fort Lee and Cliffside Park. Based on those observations one may reasonably conclude, and I do so conclude, that the conversion market in Bergen County, at least through the 1971-1978 era, was confined to those communities on the Hudson, in close proximity to the George Washington Bridge. While the attractiveness to New York City residents may have provided a great impetus to convert[5] it is likely that the then confiscatory Fort Lee rent control ordinance was also a contributing factor.[6]
*402 Commencing in 1979 conversions surged from 2,352 units which were made available in the eight preceding years, (average 294 per year) to 1,341 in that year alone. However it still appears that the conversion phenomenon was limited in scope. The study reveals that all such units which evolved in 1979 were located in Fort Lee (827) and Hackensack (514). It was not until 1980 that the conversion market spilled over its Fort Lee, Cliffside Park, Hackensack boundaries when a total of 3,118 units were created. While the bulk of the units were still located in Fort Lee and Hackensack, on a smaller scale eight of the county’s seventy communities produced over 400 units in 11 separate projects.
Finally in 1981 the market spread to many other Bergen County towns when 1,670 condominium/cooperative units, or approximately 50% of the total units which evolved in that year, were created in communities other than Fort Lee and Hackensack. These units were found in 15 complexes in ten outlying communities with 631 located in Lodi, North Arlington, Rutherford and in the subject property in Little Ferry. An additional 350 units appeared in communities such as Teaneck, Englewood, Fair Lawn, Fairview, Midland Park and Ramsey.
In summary the study shows that despite its beginnings in 1970, conversions did not begin to spread to the smaller suburban type communities until 1980. Even during that year however, approximately 85% of the condominium/cooperative units which emerged were still found in Hackensack, Fort Lee and Cliffside Park. It was not until 1981 that the conversion phenomenon spread to suburbia when 50% of the units created in that year were located therein. Clearly, as to the 1979 and 1980 assessment dates, while a conversion market existed in *403 general it did not include Little Ferry within its parameters. As of October 1, 1980, although the market in Little Ferry and its immediate environs may have been in the ripening process, it cannot be said with any degree of certainty that this garden apartment project in the Borough of Little Ferry was ripe for conversion.[7] Based on the lack of geographical support and for the additional reasons hereinafter set forth, it cannot be concluded that a prudent investor, during that time frame, would pay a premium to attempt to convert the subject premises.
That conclusion finds support in the fact that the subject was the only one of approximately eight apartment projects located in Little Ferry which converted. Noteworthy also is the fact that the offering statement and plan were only filed some nine months after the last assessing date.
In arriving at this conclusion I am mindful of the problems attendant to conversion and the time required to complete a successful conversion project. As opposed to a newly constructed building in which all units are vacant when offered for sale, conversions are beset with problems which both prolong and complicate the process. In Berkely Arms Apartment Corp. v. Hackensack City, 6 N.J.Tax 260, (Tax Ct.1984), the court discussed in detail the impact of the various statutes, administrative rules and ordinances on conversions. For example, the provisions of N.J.S.A. 2A:18-61.1 et seq. (the Anti-Eviction Act) may allow preconversion tenants to remain in occupancy for eight years following the conversion of rents governed by local rent control ordinances. N.J.S.A. 2A:18-61.31. Additionally N.J.S.A. 2A:18-61.22 et seq. (Senior Citizen and Disabled Protection Act) protects the tenancies of qualified preconversion tenants up to forty years following conversion. Tax increases resulting from the conversion are considered to be conversion costs, B.H. Assocs. v. Brudner, 185 N.J.Super. 403, 407, 449 A.2d 23 (Cty.Ct.1973) and cannot be passed on to the *404 tenants notwithstanding that a rent control ordinance seemingly permits such pass through. Litt v. Rutherford Rent Board, 196 N.J.Super. 456, 483 A.2d 239 (Law Div.1984); Prudential Insurance Co. v. Mayor & Bd. of Council of Town of Guttenberg, 196 N.J.Super. 482, 483 A.2d 417 (App.Div.1984); N.J. A.C. 5:24-1.12(c).[8]
In addition to the aforementioned regulations the provisions of rent control ordinances are also important considerations to be weighed by the prudent investor. With the possible exception of the most liberal ordinances, rent controls imposed by many municipalities in the early 1970s, have generally had a detrimental impact on multi-family residential values. Rental increases, in most if not all cases, have failed to keep pace with rapidly rising operating expenses. Meanwhile, single-family residential values, including those of condominium/cooperative apartments, have increased dramatically. As a result the value of a converted apartment building may be far greater than its value if continued as a rental project.[9] Yet, notwithstanding the income depressing effects of rent control, because of tax shelter and other benefits it may be advantageous to an investor to retain the building’s status as a rental project.
The decision to convert in rent controlled communities, to a great degree, thus depends on the nature of the allowable rent increases. The analysis of borough’s conversion study clearly demonstrates the existence of a relationship between rent eon *405 trols and conversions. Prior to 1974, while Fort Lee had a relatively liberal rent control ordinance which allowed yearly increases based upon the Consumer Price Index, only 231 rental units were converted. In 1974 the ordinance was amended and rent increases were limited to 2.5% a year. Lengthy litigation ensued and before and during the period when the ordinance was declared confiscatory, Helmsley-Spear v. Fort Lee, supra, its impact was obvious as, following the 1974 amendment through 1981, over 4,700 units were converted.[10] Although the Fort Lee conversions may have been animated in part by its choice location and by individual unit owners fleeing from New York City it is obvious that its confiscatory rent control ordinance was a major factor in the owner’s rush to convert. No such restrictive rent controls existed in Little Ferry where, as previously noted, rent increases were based on the Consumer Price Index up to a maximum of ten % a year in the 1977 rents. The influence of Little Ferry’s rent control ordinance did not pressure an apartment owner to convert to the extent that the more restrictive ordinances would impact on the decision in other communities. Although the forces of the protective legislation and rent control may not impact on conversions until the conversion occurs it is obvious that their probable effects could not be ignored by the prospective, prudent convertor; clearly they would weigh heavily in the decision to (or not to) convert.
In addition to consideration of the impact of the state and local regulations many other judgments must be made before the decision to convert can be finalized. The costs of acquiring the property and of conversion must be considered in relationship to the income and sales potential of the project. The total amount of time an investor can expect to be involved with conversion property must be estimated. Prior to the enactment of the protected tenancy statutes the holding period usually would be the time necessary to sell the units. However be *406 cause such regulations have extended that period, consideration must be given to the necessary time to obtain approvals of the plan, both local and state, as well as the sales period that may be affected by tenants refusing to vacate until they are legally forced to do so. In that regard it must be noted that no tenant may be approached until the State accepts the plan. Time must also be allocated for all studies, engineering reports, filings, hearings and approvals. ’ The amount of time needed to sell the apartment units as condominiums can be affected by a plethora of factors including the selected marketing strategy. To have a successful marketing program the condominium units must be priced competitively. Generally, this means that offering prices must be substantially below prices for newly constructed projects and in reasonable conformity with competitive conversions and resale apartment units in existing condominium buildings. Other factors to be considered include the general desirability of the project, existing tenant profile, offering prices, conversion expenses, economic conditions and the supply of units. General market acceptance of the project is, of course, governed by the property’s location, physical condition, amenities, unit mix and layout.
In view of all of the foregoing, although with each passing year borough’s conversion value theory may become more tenable, between October 1, 1978 and October 1, 1980, the first and last assessing dates, the subject premises were not ripe for conversion. Even given the lead time necessary to prepare the data for filing with the authorities, more than the mere filing of the offering statement and plan to convert some nine months after the assessment date for the last year under review is required to reach a contrary conclusion. The observation of the court in Highview Estates v. Englewood Cliffs Bor. 6 N.J.Tax 194, 200 (Tax Ct.1983), where a claim that an office building market consisted of owner-users, (based on after assessment data), as opposed to tenant occupiers was rejected, is appropriate here. “Although borough’s opinion may in the future become fact, as of the dates under consideration herein, that opinion can be viewed only as a prophecy and as premature.”
*407 The decision as to which valuation approach should predominate in the appraisal of real property depends on the facts of the particular matter and the reaction to the facts by the experts. New Brunswick v. Tax Appeals Div. supra, 39 N.J. at 544, 189 A.2d 702. Here, while both experts utilized the capitalization of income approach, neither employed the market (comparable sales) technique due to a lack of comparable sales properties in the area. As previously noted borough’s appraiser also used a cost analysis on the basis of which he found an average value of $5,347,367J[11]
The cost approach is normally relied on to value special purpose or unique structures for which there is no market. Dworman v. Tinton Falls Bor., 1 N.J.Tax 445, 452 (Tax Ct.1980). In valuing income producing properties it is an accepted fact that a prospective purchaser’s primary concern is with the anticipated return on his investment and not with the cost of construction. Parsippany Hills Assocs. v. Parsippany-Troy Hills, 1 N.J.Tax 120, 122-123 (Tax Ct.1980). It is through the capitalization of income approach that the effect of rent control is reflected. Id. at 123. Although it is not exclusive the courts have overwhelmingly relied on the income approach in valuing income producing properties. Helmsley v. Fort Lee, 78 N.J 200, 394 A.2d 65 (1978), app. dism. 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979); Parkview Village Assocs. v. Collingswood, 62 N.J. 21, 297 A.2d 842 (1972); Fort Lee v. Hudson Terrace Apts., 175 N.J.Super. 221, 417 A.2d 1124 (App.Div.1980), certif. den. 85 N.J. 459, 427 A.2d 559 (1980); Center-Whiteman Corp. v. Fort Lee, supra; Rudd v. Cranford, 4 N.J.Tax 236 (Tax Ct.1982); Jefferson House Investment Co. v. Chatham, 4 N.J.Tax 669 (Tax Ct.1982). The subject property is not unique; it is not special purpose; it is an income producing (investment) property and as such I find the capitalization of income technique to be the more reliable valuation approach.
*408 Both experts employed the building residual technique in computing a capitalization rate.[12] In defining that technique the American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) states:
When using this technique, an appraiser assumes that land or site value can be estimated independently. Starting with the known land value, the appraiser applies the land capitalization rate to the land value to obtain the amount of annual net income necessary to support land value. The appraiser then deducts this amount from the net operating income to derive the residual income available to support the investment in the buildings(s). The appraiser capitalizes this residual income at the building capitalization rate to derive an indication of the building(s)’s present value. Finally, the appraiser adds the land value to the property value. The appraiser applies the land and building capitalization rates derived from the market to the subject property----
The building residual technique requires information about present land value, current net operating income, and the land and building capitalization rates. If such information is unavailable or not reliably supported, the technique should not be employed, [at 395-396; emphasis supplied]
On the basis of a review of sales of vacant parcels borough’s expert concluded the land value to be $1,080,000 or $5,000 a unit for each year. Taxpayer’s expert concluded the unit value to be $5,000 for 1979, $6,000 for 1980 and $6,700 for 1981 or $1,080,000, $1,296,000 and $1,447,200 respectively. There was no support for the latter’s conclusions as he failed to include any vacant land sales data in his report as required by f?.8:6-l(b)2. It has been held that such lack of support in and of itself may be sufficient reason for dismissal. Willingboro Chrysler/Plymouth v. Edgewater Park, 6 N.J.Tax 168, 183 (Tax Ct.1983); Brick Assocs. v. Brick Tp., 4 N.J.Tax 510, 513 (Tax Ct.1982); Andrew Realty Co. v. Little Falls Tp., 2 N.J.Tax 114 (Tax Ct.1981). However I do not view this flaw in the land value analysis as a fatal defect particularly where, as here, the totality of the evidence permits me to make a determination of value. See Highview Estates v. Englewood Cliffs, *409 supra, 6 N.J.Tax at 202. If there is evidence in the record, properly supported in the market, from which a value may otherwise be determined, then the court should find such value and enter a judgment fixing the assessment accordingly. Samuel Hird & Sons v. Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div.1965). To be distinguished is the opinion in Herman Holding Corp. v. Montvale, 5 N.J.Tax 199 (Tax Ct.1983), where taxpayer’s complaint was dismissed for myriad reasons, including failure to support its land value.
In presenting its evidence in connection with its 1979 complaint and in answer to taxpayer’s 1980 and 1981 complaints, borough referred to six sales, none of which were of lands located in Little Ferry. However, I agree with the expert’s conclusion that all sales were in the geographical market. Sales numbers two, three and four represented an assemblage of properties which were sold in 1973. Because of their remoteness in time and the purpose for which they were acquired, no weight is attributed to them. Although sales numbers one and six were consummated in 1978 they were of relatively small parcels, (approximately 14,500 sq. ft.) compared to the 5.55 acres of the subject and thus can be attributed little weight. Sale number five was in excess of four and one-half acres and was later improved with a 253-unit garden apartment complex. The property was sold in June 1977 for $975,000 or $3,853 a unit for which the seller received all cash. The fact that the tract was improved with a dwelling when purchased is of no moment and in fact, in terms of the added expenses of demolition costs, its existence conceivably could have slightly detracted from the sales price. While the witness acknowledged the neighborhood was superior to that of the subject, given the yearly rise in property values as testified to by borough’s witness, which increase was tacitly acknowledged by taxpayer’s appraiser, I find that the sale reasonably supports a unit value of $5,000 one to three years later. I thus find the value of the land to be $1,080,000 for all years.
An analysis of their respective capitalization of income approaches commences with a determination of economic rent. *410 Rodwood Gardens, Inc. v. Summit, 188 N.J.Super. 34, 455 A.2d 1136 (App.Div.1982). Taxpayer, based on a review of rents charged in another Little Ferry garden apartment complex, and noting that the rents of the subject were controlled by ordinance, found the actual rents represented economic rent. Borough’s expert, noting that the actual rents were not at the maximum permitted by the rent control ordinance, using the actual 1978 rents as his base, applied the Consumer Price Index factor in 1979 (6.2%) and in 1980 and 1981, when the Consumer Price Index exceeded the ten % maximum increase permitted by the ordinance, utilized the ten % maximum. He arrived at economic rents considerably in excess of the actual rents.
In First Real Estate Investment Trust v. Hasbrouck Heights, 190 N.J.Super. 85, 461 A.2d 1210 (App.Div.1983), notwithstanding that Hasbrouck Heights rental properties were subject to rent stabilization, the court rejected taxpayer’s expert’s opinion that actual rents equalled economic rents. The court held that it was incumbent upon the appellant to establish that the base rent, i.e., the rent charged in the year immediately preceding the adoption of the rent control ordinance, was economic rent. The court also suggested that rents should be compared with those charged in comparable properties.
That concept has met considerable resistance in the appraisal fraternity on the basis that rent control ordinances affect individual rent rolls differently. The ordinances usually require that a formula be applied to each property which results in varying annual percentage increases. According to the opponents, to attempt to compare the rents of one property with those charged by another is a futile exercise because whether the comparable rents are higher or lower the rents under review cannot be adjusted except within the parameters allowed by the ordinance. Regardless of what the rents could have been had the base rents been higher, the reality of the matter is that the purchase price paid by a prudent investor will be based on the income permitted by ordinance.
*411 That argument, in general, makes eminently good sense. Absent rent controls it is obvious that the entire market must be analyzed. All rents, those charged in the subject as well as those in comparable properties, must be reviewed in order to arrive at a fair market rental.; Even with respect to that review the Supreme Court in Parkview Village Assocs. v. Collingswood, supra, said:
In the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project like this, functioning as customary with leases of relatively short length, should be deemed prima facie to represent its fair rental value for purposes of the capitalized income method of property valuation. A court or taxing agency should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent. That approach, we believe, conduces to the objective of relative stability of assessments which we have heretofore held to be basic to sound tax assessment policy. New Brunswick v. State of N.J. Div. of Tax Appeals, supra (39 N.J. at 541 [189 A.2d 702]); Switz v. Middletown Twp., 23 N.J. 580, 596 [130 A.2d 15] (1957); Hackensack Water Co. v. Div. of Tax Appeals, 2 N.J. 157, 163 [65 A.2d 828] (1949). Readily to be distinguished is the case of a taxpayer owning commercial property tied to a long term lease made long before the current assessing date, where the present rent may well be out of line with current fair rental value. [62 N.J. at 34-35, 297 A.2d 842],
A review of pre-ordinance rents or rents charged in a similarly rent controlled comparable apartment complex, could not produce convincing evidence that the actual rents were below market rents. In rent control communities it is the ordinance itself that establishes the market. Because of the artificially imposed ceilings a requirement that such a search be conducted would result in added time and expense to both the bench and bar with a probable chilling effect on tax appeals.
Conversely it would be erroneous, simply because rents are subject to controls, to blindly accept the actual rents as market rents. Although a complex may be well managed, as obviously the subject was, other factors such as the tax benefits which accrue to an owner may nevertheless encourage that owner to retard the rents. In the instant matter, while the rents were higher than those charged in other Little Ferry complexes, they were nevertheless lower than those permitted by ordinance. The owner/operator testified that an increase in *412 rents to the maximum allowed would adversely affect the occupancy rate. That such is not the case is evidenced by the facts.
As previously noted the vacancy rate in this complex averaged .017% for the three years under review. During that same period the rents from 1977-1978 were increased by 3.06%, by 8.88% in 1978-1979 and by 2.6% in 1979-1980. The fact that during 1978-1979, the period of the greatest rental increase, there were but two vacancies belies taxpayer’s theory that maximum rent increases would considerably increase the vacancy rate. Quite to the contrary I find that the imposition of maximum increases, (the rents which would be charged by the prudent, hypothetical purchaser), would not have adversely affected the occupancy rate to any great extent.
Based on the Consumer Price Index the 1977-1978 rent could have and, from an economic rent standpoint, should have been increased by 6.2% to a total of $820,759. In the 1978-1979 and 1979-1980 periods the rents could have been increased by ten % to $902,835 for the 1980 tax year and $993,119 for the 1981 tax year. I conclude that the foregoing represent economic rents.[13]
Taxpayer’s expert, having used the actual rents, allowed no deduction from gross rental income for vacancies or credit losses. There was no logical explanation for the inconsistent vacancy allowance made by borough’s witness, less than one % for 1979, over four % in 1980 and over three % in 1981. Noting that the actual vacancy rate was .017%, I find an allowance of two % is fair and reasonable taking into account that the higher economic rents may result in a slightly higher vacancy rate.
Concerning additional income from the complex, both experts used the same income from the swimming pool operation as *413 found in the income and expense statement prepared by taxpayer’s accountants. While both used the same amount for income from washing machines and interest (these sums were lumped together in one account) for the 1979 tax year, in 1980 and 1981 taxpayer’s expert made a deduction for interest earned from sources other than from the complex whereas borough’s expert utilized the total amount reported. Borough’s suggestion that all interest income resulted from interest earned on security deposits as permitted by N.J.S.A. 46:8-19 was without support. The increase in this account from 1977-1978 to 1979-1980 as reflected in the accountant’s statement was between 300%-400%. It is unrealistic to assume that such a great increase could be accounted for by increased usage of the laundry facilities or increased security deposits. Neither the occupancy rate in the complex nor the interest paid on security deposits varied to any great extent during that period. More credible and logical was taxpayer’s witness’ testimony that in the latter two years interest income from other sources unrelated to the subject was included in that account. In accepting the additional income as found by taxpayer’s witness the total gross income, after allowance for vacancies is $816,153 for 1979, $898,955 for 1980 and $981,800 for 1981.
The major discrepancy concerning expenses between the experts was in the amount to be deducted for wages and reserve for replacements. Both experts allowed deductions from the total effective income of five % for management which is found to be fair and reasonable. They both used actual expenditures for all other expenses.[14]
Borough alleged that there was a duplication of expenses in taxpayer’s use of a five % management fee plus the inclusion of wages for managerial personnel. The wages plus a management fee exceeded one-third of the total expenses for each year. The complex employed only one full-time office employee whose *414 duties consisted of receiving tenant complaints, collecting rents, keeping the books and showing and renting apartments. Taxpayer admitted that this person served as the on-site manager.
Management is a proper expense for every income-producing property regardless of whether an actual management fee is paid. The management allowance reflects an expenditure of time for accounting, rent collection, advertising and supervision, relative to the operation of a rental property, whether performed by an owner or a professional management firm. The allowance for management is not to be confused with salaries actually paid to employees necessary to maintain the property and provide the operational activities necessary to keep a multi-tenanted apartment such as the subject physically, functionally, and economically competitive. The Appraisal of Real Estate, supra at 365, 366-367.
I find, based on the testimony adduced in this matter, that the stabilized management expense is duplicative of a portion of the wages expense, i.e., the office employee’s salary. The tasks performed by that employee would be provided by a management firm and thus that salary is included in the management allowance and will be deducted from the wages expense.
Concerning a reserve for replacement of the short-lived items such as refrigerators, dishwashers, ovens-ranges, air-conditioners and carpeting, all of which were supplied to the tenants by taxpayer, taxpayers’s expert based the amount for replacement on his estimate of cost and useful life. Although his estimate of remaining life was conservative when compared to that testified to by the taxpayer, whose experience in owning and operating apartments was substantial, his cost estimates were without foundation and were thus unreliable. Conversely, given the superior nature of this complex and the above average appliances and amenities furnished to the tenants, I find that borough’s two % allowance for replacement is insufficient. I find an annual reserve of three % of the effective income is fair and reasonable.
*415 Based on the foregoing a reconstruction of the income and expenses for each year is as follows.
1979 1980 1981
Economic rent $820,759 $902,835 $993,119
Less: Vacancy allowance 16,415 18,057 19,862
Effective apartment rents 804,344 884,778 973,257
Other Income 11,809 14,177 8,543
Total effective income $816,153 $898,955 $981,800
Less: Expenses
Management 40,808 44,948 49,090
Wages 24,553 29,581 30,712
Reserve for replacement 24,485 26,969 29,454
Painting 16,083 16,083 16,083
All other expenses 91,330 82,659 104,641
Total expenses $197,259 $200,240 $229,980
Total effective income $816,153 $898,955 $981,800
Total expenses 197,259 200,240 229,980
Income available for capitalization $618,894 $698,715 $751,820
The capitalization rates used by both experts include a tax rate factor. See New Brunswick v. Tax Appeals Div., supra. The actual tax rates, which were used by borough’s expert in his capitalization rate, in Little Perry were $2.36 in 1979 and 1980 and $2.57 in 1981. Discrimination being in issue for all years, see Weyerhaeuser Co. v. Closter Bor., 190 N.J.Super. 528, 464 A.2d 1156 (App.Div.1983), taxpayer reduced the actual tax rate to an effective tax rate by applying to the former an unweighted, unclassified ratio. He also claimed that said ratio should be applied to the true values in order to correct the alleged discriminatory assessments. Alternatively taxpayer seeks the application of the ratio promulgated by the Director of the Division of Taxation pursuant to N.J.S.A. 54:51A~6 (commonly referred to as chapter 123).[15]
*416 It is clear that borough erred in its use of the actual tax rate as opposed to an effective tax rate. New Brunswick v. Tax Appeals Div., supra, 39 N.J. at 546, 547, 189 A.2d 702. Thus the court need only determine whether the chapter 123 or the unweighted, unclassified ratio should be used to determine an effective tax rate and applied to true value if relief from discrimination is warranted.
In each year taxpayer produced a ratio study for the Borough of Little Ferry based on the usable sales and concluded that the common level of assessment for 1979 was 93.13%, 81.09% in 1980 and 74.27% in 1981.[16] Prior to the advent of chapter 123 in 1978, in a discrimination action, a party labored to prove the elements of discrimination through such studies.[17] Chapter 123 effectively relieved a party from proving such elements except the element of true value.
*417 In Murnick v. Asbury Park, 95 N.J. 452, 471 A.2d 1196 (1984) the Court addressed the issue of whether chapter 123 was intended to replace all other forms of relief in discrimination cases, i.e., its exclusivity. While holding that chapter 123 established only a rebuttable presumption of the common level of assessment, the Court said:
Nonetheless, to the extent that a taxpayer relies on a presumptive ratio to establish a common level of assessment, we find that the Legislature intended to restrict the taxpayer to the Director’s average ratio determined under Chapter 123. In the absence of additional proof, a taxpayer may not substitute another statutory ratio such as that computed under N.J.S.A. 54:1-35.1. To overcome the presumption that the Chapter 123 ratio reflects the common level, the taxpayer must establish that application of the ratio would be “virtually confiscatory.” 525 Realty Holding Co. v. Hasbrouck Heights, supra, 3 N.J.Tax at 216. As a practical matter, the presumption created by Chapter 123 is so strong that it will be conclusive in all but the most egregious cases. Jefferson House Investment Co. v. Chatham, supra, 4 N.J.Tax at 682-84.
Here, however, the taxpayer adduced no evidence that the Chapter 123 ratio was confiscatory. Without such proof, we agree with the Appellate Division, 187 N.J.Super. [455] at 462 [455 A.2d 504] that the Tax Court should not have automatically substituted the school aid ratio for the Chapter 123 ratio. In this case, we need not set the outer limits of the constitutional right. It is sufficient to note that a taxpayer’s right to relief should be determined in accordance with Chapter 123 in all but the most extreme or severe circumstances, [at 463, 471 A.2d 1196],
Here, taxpayer has submitted no proofs that the chapter 123 ratios were “virtually confiscatory” nor that they were arrived at in an arbitrary, capricious or erroneous manner or were themselves discriminatory. Weyerhaeuser Co. v. Closter Bor., supra, 190 N.J.Super. 539, 464 A.2d 1156. Taxpayer would simply have the court substitute the unweighted, unclassified ratios for the chapter 123 ratios because, in the judgment of the expert, the former were a better reflection of the Little Ferry common level of assessment. Certainly when compared to the chapter 123 ratios the use of the unweighted, unclassified ratios were better for taxpayer’s purposes but that opinion affords the court no reason to find that the “rebuttable presumption” established by chapter 123 is overcome. Therefore *418 if the taxpayer is entitled to relief from discrimination that relief will be afforded through the application of chapter 123.[18]
In arriving at their interest components (return on investment) of their respective capitalization rates, both experts relied on various well documented sources including mortgage interest rates and rates of return on alternative investments. Taxpayer’s rates of return were 10.13%, 10.50% and 10.88% while borough’s rates were 9%, 9.5% and 10% for 1979, 1980 and 1981 respectively. While these returns may not dramatically differ, a slight difference may have a large impact on the final conclusion of value.
A review of the testimony of both experts and of the American Council of Life Insurance tables and of rates of return on alternative investments indicated that both the mortgage and money market rates were rising rapidly. I note that as of the three critical assessing dates mortgage interest rates on conventional apartments rose from 9.9% to 12.41% and returns on corporate bonds from 8.89% to 12.31%. However, as this court stated in Berkley Arms v. Hackensack, supra:
As in the case of forecasting the weather, forecasting interest rates is also very unpredictable. Thus, in view of the need for stability in taxation, our cases uniformly hold that the true value of realty must be fairly constant and must be gauged by conditions not temporary or extraordinary but by those which over a period of time will be regarded as measurably stable, [citations omitted]. In Hackensack Water Co. v. Div. of Tax Appeals, 2 N.J. 157, 163 [65
*419 A.2d 828] (1949) it was said that value for purposes of taxation has a measure of permanency which renders it secure against general temporary inflation or deflation. In New Brunswick v. State of N.J. Div. of Tax Appeals, supra, it was said that the rate of return should reflect conditions for a reasonable span of years. In Murnick v. Asbury Park, 2 N.J.Tax 168 (Tax Ct.1981) it was stated that the assessment process cannot be so acutely sensitive to rates of return available to money markets to require an assessor to adjust his assessment roles to yearly fluctuations. [6 N.J.Tax at 286]
I also note that the rates quoted by the witnesses were mortgage interest rates. There is a difference between such rates and the return sought by a real estate investor. This was long ago recognized in New Brunswick v. Tax Appeals Div., supra, where Chief Justice Weintraub said:
The rate of return, the most significant factor in the capitalization process, is difficult to find yet a small difference has a large impact. A court cannot assume the correct answer will be had merely by adding some factor to what would be charged for a well secured loan, for while it is true that there is little risk in such a loan, it is equally true that there is no hedge against a shrinking dollar or opportunity for gain in a rising market. Moreover, the owner obtains a deduction for depreciation on his income tax return which the mortgage lender does not, and, hence the apparent return is increased in real value. [39 NJ. at 551, 189 A.2d 702],
The same can be said of the interest rates on the alternative investments utilized by the witnesses. If there is any correlation between the money market rates and real estate capitalization rates it is obvious that the real estate rates most closely parallel the tax exempt rates. Certainly prime rates are not of any great significance to the mortgage lender or to the equity investor.
Applying the foregoing principles, I find that the rates of return on an investment in a conventional garden apartment complex as of the three assessing dates are 9%, 9.5% and 10.5%. To the return on the investment is added a 2.5% rate for return of investment, both experts having agreed that the remaining economic life of the complex is forty years, and the effective tax rate for each year which is found by applying the chapter *420 123 ratio to the actual tax rate. The rates of capitalization are thus found to be .1386 for 1979, .1431 for 1980 and .1547 for 1981.[19]
Applying those rates to the land value of $1,080,000 (a rate for recapture is not applied to land as it is not a wasting asset) the income attributable to the land is $122,688 in 1979, $127,548 in 1980 and $140,076 in 1981. The income to the improvement is $496,206 in 1979, $571,167 in 1980 and $611,744 in 1981 which, when capitalized, results in improvement values of $3,580,130, $3,991,384 and $3,954,389 respectively. By adding thereto the value of the land, true values of $4,660,130 in 1979, $5,071,384 in 1980 and $5,034,389 in 1981 result.
The ratios between the assessment and true values are 106% in 1970 and 98% in 1980 and 1981. The 1979 and 1980 ratios are identical to the chapter 123 ratios while the 1981 ratio is two % greater. That result is an indication of not only a good chapter 123 sales study but also of good assessing practice. However, because the 1979 ratio exceeds the county level of 100% the assessment will be reduced to the true value. In 1980 and 1981, the assessment-true value ratios not being in excess of the upper limits of chapter 123, the assessments will be affirmed.
The Clerk of the Tax Court is directed to enter judgment as follows:
1979 1980-1981
Land $1,080,000 $1,080,000
Improvements 3,580,130 3,877,500
Total $4,660,130 $4,957,500

 See also Genola Ventures-Shrewsbury v. Shrewsbury, 2 N.J.Tax 541 (Tax Ct.1981) in which Judge Andrew analyzed the approach in the context of a vacant land subdivision.

 The Bamberger decision, which was rendered 15 years prior thereto, was not reversed, modified, or even referred to in New Brunswick.

 Conversion activity is not confined to the Bergen-Hudson Counties area. The court takes notice of the statistics maintained by the State’s Department of Community Affairs, which show that in the five-year period ending May 1984 (the compilation of such statistics only commenced with the enactment of the regulatory law in November 1978), while Bergen County led the State with 93 property conversions involving 11,621 apartments or dwelling units, Atlantic County was second with 62 conversions involving 5,165 dwelling units, some of which included motels. In fact dozens of motels, largely near the ocean fronts of Atlantic, Cape May and Monmouth counties, have converted to condominiums, some selling for well over $100,000 a unit. The third highest number of conversions, according to the department's figures for the five-year period, occurred in Essex County which has developed into another popular site for New York’s condominium buyers. The figures show 3,093 conversions in Essex, followed by 2,980 in Hudson and 2,604 in Monmouth.

 Although borough’s expert employed June 1981 as the conversion date, it was on that date that the offering statement and plan to convert was filed. The deed conveying the property was dated February 1982. The contract of sale however was executed in January 1981.

 See Center-Whiteman Corp. v. Fort Lee, supra, where the taxing district’s expert testified that purchasers were “fleeing from New York City.” 4 N.J.Tax at 163.

 See Helmsley Spear v. Fort Lee, 78 N.J. 200, 394 A.2d 65, cert. den. 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979) which held the ordinance to be *402 confiscatory and Hampshire House v. Fort Lee, 172 N.J.Super. 426, 412 A.2d 816 (Law Div.1979) where the court declared the borough’s conversion moratorium ordinance void in its entirely.

 "Ripe: ... fully grown and developed; mature; fully arrived." Webster’s New Collegiate Dictionary (1979).

 For a general discussion of the Anti-Eviction Act as it applies to pre-existing tenancies in converted buildings, see G.D. Management Co. v. Negri, 182 N.J.Super. 409, 442 A.2d 611 (App.Div.1982), Plaza Joint Venture v. Atlantic City, 174 N.J.Super. 231, 416 A.2d 71 (App.Div.1980) and Hampshire House Corp. v. Fort Lee, supra.

 See generally "Market Rent v. Replacement Rent: Is Rent Control The Solution?”, The Appraisal Journal, (Jan. 1983) at 89, for a discussion of the pros and cons of rent control. See also 525 Realty Holding Co. v. Hasbrouck Heights, 3 N.J.Tax 206 (Tax Ct.1981), "the long and short of the rent control factor is that despite some degree of correlation in terms of determining value, value for purposes of rent stabilization works adversely vis-a-vis value for property tax and investment purposes." Id. at 219.

 Although 1,630 condominium units in Cliffside Park came into existence in 1971-1973 they were not conversions. From the outset the units were sold as condominiums and thus were never subject to rent control.

 The court having found that the subject was not “ripe for conversion" borough’s market approach based on its conversion theory need not be discussed.

 Although taxpayer’s expert used a band of investment, mortgage-equity, analysis in developing the interest (return on investment) rate, he did not employ an overall rate. He applied the interest rate to his opinion of land value and the interest plus a recapture (return on investment) rate to the improvement income. The effective tax rate was added to both of the foregoing.

 That conclusion was buttressed by the testimony of taxpayer’s expert on cross-examination. Notwithstanding his earlier use of lower rental income he admitted to economic rents that resulted in considerably higher totals which were consistent with those found by the court based on the maximum allowable increases. Based on this testimony the difference between the court’s finding and his later opinion of economic rents was minimal.

 Borough’s appraiser used the actual painting expense for each year while taxpayer’s witness deducted the average of that expense for the three years. In the interest of stability I will also use the three year average.

 Weyerhaeuser Co. v. Closter Bor., supra, held that the provisions of chapter 123 applied to every case except where prohibited by statute and thus relief *416 from discrimination need not be specifically pleaded. However, where a party seeks application of a ratio (to true value) other than the chapter 123 ratio, discrimination must be affirmatively and timely pleaded. Id. 190 N.J.Super. at 529, 464 A.2d 1156. Here taxpayer affirmatively and timely pleaded discrimination in each year.

 The chapter 123 ratios were 106% in 1979, 98% in 1980, and 96% in 1981.

fThe elements of a Kents action (In re Appeal of Kents, 34 N.J. 21, 166 A.2d 763 (1961)) were succinctly set forth in Continental Paper Co. v. Ridgefield Park, 122 N.J.Super. 446, 300 A.2d 850 (App.Div.1973):
In order to make out a case of actionable discrimination, these elements must be proved: (1) that the real property generally in the municipality was assessed at less than true value; (2) what the common assessment level was and (3) the true value of the subject property upon which the common level percentage would operate. Reading Co. v. Woodbridge Township, 45 N.J. 407, 426 [212 A.2d 649] (1965); Matawan v. Tree Haven Apartments, Inc., supra, 108 N.J.Super. [111] at 116 [260 A.2d 235]; Feder v. Passaic, 105 N.J.Super. 157, 160 [251 A.2d 457] (App.Div.1969). If there is no common level shown and there is none which the assessor is endeavoring to apply, and the assessment is substantially higher than the "average ratio” determined by the Director of Taxation, the "average ratio" may be applied under Kents, and the assessment reduced by that proportion. Matawan v. Tree Haven Apartments, Inc., supra, 108 N.J.Super. at 116 [260 A.2d 235]; Feder v. City of Passaic, supra, 105 N.J.Super. at 166 [251 A.2d 457]. [122 N.J.Super. at 450-451, 300 A.2d 850],

 Confronted with the appropriateness of applying an unweighted, unclassified ratio instead of the Chapter 123 ratios, in Rudd v. Cranford, supra, Judge Crabtree stated:
The Chapter 123 ratio is promulgated by the Director as of October 1 of the pretax year. N.J.S.A. 54:l-35a (now NJ.S.A. 54:51A-6). Plaintiff, however, uses the unweighted, unclassified ratio promulgated as of October 1 of the tax year. Plaintiffs comparison is inappropriate. The constitutional sufficiency of the statutory remedy for discrimination can only be examined by comparing two ratios promulgated as of the same date. Given the obvious fact of a significant annual appreciation in value of the generality of properties in a municipality such as Cranford, and the reflection thereof in a declining average ratio, the use of a ratio promulgated one year later than the ratio with which it is compared in aid of ascertaining the latter’s constitutional adequacy is manifestly unfair and inequitable to defendant and its other taxpayers. [4 NJ.Tax at 248-249].

 In 1979 the chapter 123 ratio of 106% exceeded the county level of 100%. Thus the actual tax rate was used in the capitalization rate.