**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS**

| | | |
|---|---|---|
| _____ | ) | |
| COTTONTAIL HOLDINGS, LLC, | ) | TAX COURT OF NEW JERSEY |
| | ) | DOCKET NO. 008402-2010 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOWNSHIP OF FRANKLIN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| TWO FRANKLIN REALTY, LLC, | ) | TAX COURT OF NEW JERSEY |
| | ) | DOCKET NO. 004144-2011 |
| Plaintiff, | ) | DOCKET NO. 000472-2012 |
| | ) | |
| v. | ) | |
| | ) | OPINION |
| TOWNSHIP OF FRANKLIN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Decided:  June 5, 2019

Christopher John Stracco, Esq.
(Day Pitney, LLP, attorneys) for plaintiff.

Gregory B. Pasquale, Esq.
(Shain Schaffer, P.C., attorneys) for defendant.

DeALMEIDA, J.T.C. (t/a)

This is the court's opinion after trial in the above-referenced matters challenging the local property tax assessments on a parcel of real property in Franklin Township, Somerset County, for tax years 2010, 2011, and 2012.  For the reasons explained more fully below, the assessment is reduced for each tax year.

*

I.  Findings of Fact

As of October 1, 2009, the first valuation date, plaintiff Cottontail Holdings, LLC (Cottontail) was the owner of the subject property.  The parcel, commonly known as 200 Cottontail Lane, is designated in the records of the municipal tax assessor as Block 517.06, Lot 15.10, and consists of 14.48 acres on which sits two, two-story office buildings constructed in 1985 and 1986. The buildings, which are separated by a common atrium, have a total of 204,432 square feet of rental office space with typical finish and amenities, elevators, and no basement storage area.[1]  The site improvements include 818 parking spaces, which are sufficient for the amount of office space. The subject property, which is close to an exit off Interstate 287, is in a zone that allows light manufacturing, industrial, and office uses.

On September 28, 2010, plaintiff Two Franklin Realty, LLC (Two Franklin) obtained title to the subject property through a deed in lieu of foreclosure.  The deed was in the possession of a commercial bank that had issued a note secured by the subject property on which Cottontail had defaulted.  Two Franklin purchased the note from the lender for $6.5 million, exercised the deed, and took title to and possession of the subject property.

At the time Two Franklin obtained title to the subject property, the buildings were in a state of disrepair as the result of significant deferred maintenance.  A property condition report prepared by a construction consultant admitted into evidence detailed very poor conditions.  The integrity of exterior walls of the buildings, which were concrete attached to the metal frame, was threatened by worn caulking.  In addition, the buildings showed significant signs of damage from water leaks. The buildings had an unusual design feature: second-floor office space had access to terraces over

---

[1] The parties do not agree on the size of the improvements at the subject property, although the measurements they offer differ by only approximately two percent.  The court finds credible the square footage opinion of plaintiff's expert.

first-floor office space. Sliding glass doors to the terraces, however, were not closing correctly, allowing the weather to come into the building. In addition, failed membranes on the terraces allowed water to enter the first-floor office space. Faulty electric heat pumps also introduced water into tenant spaces. In one first-floor unit leaking was severe enough to cause a ceiling collapse. Window gaskets were missing in some places and all of the windows needed to be resealed. The central atrium skylight was also leaking. The HVAC system and a cooling tower were not functioning. Electric metering at the subject property had not kept pace with the rental of units. Thus, tenant electric costs were likely inaccurate.

The parking lot was peppered with cracks, some with plants growing through the blacktop. Curbing and sidewalks were spalling and chipped. Landscaping had not been maintained and the central courtyard water feature was not operating. The exterior of the building was unclean, requiring a power wash. Importantly, the roofs of both buildings were near the end of their useful lives and needed to be replaced. The consultant's report estimated a need for $209,870 in immediate repairs, as well as an additional $976,627 over a two- to five-year period, mostly attributable to roof replacement. The consultant also estimated that replacement of the HVAC system would cost $2,433,000.

At the time Two Franklin came into possession of the subject property, the buildings were nominally seventy-four percent under lease. However, this figure included tenants who had vacated the subject property because of its poor condition, some who had ceased paying rent, as well as tenants who were threatening to follow suit. One tenant who occupied approximately fifty percent of the improvements had vacated the subject property and rented space in a nearby building. The broker involved in the tenant's departure was paying the rent on the departed tenant's lease for the remaining approximately one year of its term. Two Franklin was compelled to bring

3

suit against a number of tenants to recover unpaid rent. Intent on reversing the financial condition of the subject property, Two Franklin retained a broker to market leases to the office sector.

As of October 1, 2011, the subject property was approximately eighty-eight percent vacant. Two Franklin had completed some work on the exterior of the building, which had been power washed and sealed. Some drainage issues had been addressed, as had some interior damage from leaks. The curbs around the building were replaced and parking lot cracks temporarily sealed. The underlying damage to the parking lot was not repaired. Nor had the roofs been replaced.

For tax years 2010, 2011, and 2012, the subject property was assessed as follows:

| | |
|---|---|
| Land | $ 3,448,000 |
| Improvement | $20,654,000 |
| Total | $24,102,000 |

Because the municipality implements a district-wide reassessment annually, the Chapter 123 average ratio for tax years 2010, 2011, and 2012 is presumed to be 100% and the assessments are presumed to reflect true market value. See N.J.S.A. 54:51A-6(d).

Cottontail filed a complaint challenging the assessment for tax year 2010. The municipality filed a counterclaim seeking to raise the assessment for that tax year. Two Franklin filed a complaint challenging the assessments for tax years 2011 and 2012. Defendant did not file a counterclaim for those tax years. The matters were consolidated and tried over four days.

Each party presented an expert real estate appraiser who offered an opinion of the true market value of the subject property on the three valuation dates, October 1, 2009, October 1, 2010, and October 1, 2011. Their opinions of value are summarized as follows:

| Tax Year | 2010 | 2011 | 2012 |
|---|---|---|---|
| Valuation Date | 10/1/2009 | 10/1/2010 | 10/1/2011 |
| Plaintiff's Expert | $ 8,250,000 | $ 6,650,000 | $ 6,250,000 |
| Defendant's Expert | $23,500,000 | $23,200,000 | $23,100,000 |

4

## II. Conclusions of Law

The court's analysis begins with the well-established principle that "[o]riginal assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as:

> The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be "definite, positive and certain in quality and quantity to overcome the presumption."
>
> [Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985)).]

The presumption of correctness arises from the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote, 100 N.J. at 413 (citing Powder Mill I Assocs. v. Twp. of Hamilton, 3 N.J. Tax 439 (Tax 1981)); see also Byram Twp. v. W. World, Inc., 111 N.J. 222 (1988). This presumption remains "in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity." Transcon. Gas Pipe Line Corp. v. Twp. of Bernards, 111 N.J. 507, 517 (1988).

"The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Twp. of Little Egg Harbor v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998); see City of Atl. City v. Ace Gaming, LLC, 23 N.J. Tax 70, 98 (Tax 2006). "In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the case through the

5

close of all proofs." MSGW Real Estate Fund, 18 N.J. Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence "as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). In order to overcome the presumption, the evidence "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" W. Colonial Enters., LLC v. City of E. Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)), aff'd, 21 N.J. Tax 590 (App. Div. 2004).

Only after the presumption is overcome with sufficient evidence at the close of trial must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38 (App. Div. 1982). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed and the court need not proceed to making a value determination. Ford Motor Co. v. Twp. of Edison, 127 N.J. 290, 312 (1992); Glob. Terminal & Container Servs. v. City of Jersey City, 15 N.J. Tax 698, 703-04 (App. Div. 1996).

The court concludes that the opinions of value offered by plaintiff's expert, which were based on an accepted methodology for determining value and on evidence of the type often used for such determinations, if accepted as true, raise doubt in the court's mind with respect to whether the assessment on the subject property exceeded its true market value for tax years 2010, 2011,

and 2012. As explained above, plaintiff's expert opined that the subject property's true market value was significantly below the assessment on the property for each tax year. Thus, the presumption of correctness attached to assessments has been overcome.

The court's inquiry, however, does not end here. Once the presumption is overcome, the "court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co., 127 N.J. at 312 (quotation omitted). "[A]lthough there may have been enough evidence to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case . . . ." Id. at 314-15 (citing Pantasote, 100 N.J. at 413).

A.    Highest and Best Use.

A determination of true market value requires a determination of the property's highest and best use on the relevant valuation dates. See Clemente v. Twp. of S. Hackensack, 27 N.J. Tax 255, 267-69 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). Both experts opined that the highest and best use of the subject property was its continued use for office rental space to multiple tenants. The court finds the experts' opinions on this point to be credible and adopts their proffered highest and best use conclusions.

B.    Approaches to Valuation.

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 2006). "There is no single determinative approach to the valuation of real property." 125 Monitor St., LLC v. City of Jersey City, 21 N.J. Tax 232, 237-38 (Tax 2004) (citing Samuel Hird

& Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965); ITT Cont'l Baking Co. v. Twp. of E. Brunswick, 1 N.J. Tax 244 (Tax 1980)), aff'd, 23 N.J. Tax 9 (App. Div. 2005). "The choice of the predominant approach will depend upon the facts of each case and the reaction of the experts to those facts." Id. at 238 (citing City of New Brunswick v. Div. of Tax Appeals, 39 N.J. 537 (1963); Pennwalt Corp. v. Twp. of Holmdel, 4 N.J. Tax 51, 61 (Tax 1982)).

The comparable sales approach "usually provides the primary indication of market value in appraisals of properties that are not usually purchased for their income-producing characteristics." Appraisal Institute, The Appraisal of Real Estate, 419 (12th ed. 2001). This method of valuation has been defined as "[a] set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison, and making adjustments to the sales prices of the comparables based on the elements of comparison." Id. at 417.

The income capitalization approach is the preferred method of estimating the value of income producing property. Parkway Vill. Apartments Co. v. Twp. of Cranford, 108 N.J. 266, 270 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value." Appraisal Institute, The Appraisal of Real Estate 445 (13th ed. 2008). This approach generally applies to real property that generates income from the rental of the property, not from the business activities that take place at the property.

The cost approach is normally relied on to value special purpose property or unique structures for which there is no market. Borough of Little Ferry v. Vecchiotti, 7 N.J. Tax 389, 407 (Tax 1985); Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445, 452 (Tax 1980), aff'd, 180

8

N.J. Super. 366 (App. Div. 1981). The cost approach "involves a replication, through the use of widely accepted cost services . . . of the cost of the components of the building to be valued, less . . . depreciation[s]." Gale & Kitson Fredon Golf, LLC v. Twp. of Fredon, 26 N.J. Tax 268, 283 (Tax 2011) (quotation omitted). "A cost approach has two elements – land value and the reproduction or replacement cost of the buildings and other improvements." Int'l Flavors & Fragrances, Inc. v. Borough of Union Beach, 21 N.J. Tax 403, 417 (Tax 2004). Depreciation from all causes is deducted from the reproduction cost new. Depreciation is defined as a loss in value from three causes: physical depreciation, functional obsolescence, and external economic factors. The cost approach is most effective when the property being valued is new, in light of the difficulties in accurately estimating the various components of depreciation. See Worden-Hoidal Funeral Homes v. Borough of Red Bank, 21 N.J. Tax 336, 338 (Tax 2004).

Plaintiff's expert relied primarily on the income capitalization approach to determine true market value, although he also relied on the comparable sales approach as an indicator of value. Defendant's expert used only the income-capitalization approach to reach his opinions of true market value. In light of the court's determination that the subject property's highest and best use is for rental in the office market to multiple tenants, the court concludes that the income capitalization approach is the most credible method for determining the subject property's true market value.[2]

---

[2] In light of its determination with respect to the most credible approach to determining the true market value of the subject property, the court makes no findings with respect to whether the September 29, 2010 transfer of the subject property to Two Franklin was the result of an arms' length transaction. As a result, the court does not consider whether the $6.5 million Two Franklin paid for the right to obtain title to the subject property is credible evidence of its true market value.

C.     Calculation of Value Using Income Capitalization Approach.

Determining the value of real property pursuant to the income capitalization approach can be summarized as follows:

$$\begin{array}{rl} & \text{Market Rent} \\ \text{x} & \underline{\text{Square Footage}} \\ & \text{Potential Gross Income} \end{array}$$

$$\begin{array}{rl} \text{-} & \underline{\text{Vacancy and Collection Losses}} \\ & \text{Effective Gross Income} \end{array}$$

$$\begin{array}{rl} \text{-} & \underline{\text{Operating Expenses}} \\ & \text{Net Operating Income} \end{array}$$

$$\begin{array}{rl} \div & \underline{\text{Capitalization Rate}} \\ & \text{Value of Property} \end{array}$$

See Spiegel v. Town of Harrison, 19 N.J. Tax 291, 295 (App. Div. 2001), aff'g, 18 N.J. Tax 416 (Tax 1999); Appraisal Institute, The Appraisal of Real Estate 466 (13th ed. 2008).

1.     Market Rent.

"Central to an income analysis is the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Vill. Apartments, 108 N.J. at 270. This differs from the actual rental income realized on the property, which may be below market rates. Parkview Vill. Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972). However, actual income is a significant probative factor in the inquiry as to economic income. Id. at 30. "Checking actual income to determine whether it reflects economic income is a process of sound appraisal judgment applied to rentals currently being charged for comparable facilities in the competitive area." Ibid.

For tax year 2010, plaintiff's expert identified five comparable leases of office space in Franklin Township, all of which commenced in 2009 or 2010. The expert described the leases in detail, including identifying the person with whom he confirmed the lease information. For each

comparable lease, the expert deducted from the average gross rent, free rent and tenant improvement allowances, where applicable. He thereafter adjusted the baseline average gross rent to account for time, and the age and quality of improvements. The expert applied a tenant improvement allowance of $15.00 per square foot over five years, or $3.00 per square foot per year. He based this adjustment on information he received from consultation with brokers. Ultimately, the expert concluded market rent of $18.25 per square foot, which included market rent of $15.00 per square foot and $3.00 per square foot for tenant improvements.

Plaintiff's expert took a similar approach for tax year 2011, for which he identified eight comparable leases of office space in Franklin Township. For that tax year, the expert, after making necessary adjustments and weighing the leases, opined a market rent of $17.00 per square foot, which included market rent of $14.00 per square foot and $3.00 per square foot for tenant improvements. The expert identified nine comparable leases for tax year 2012. His adjustments and consideration of the leases resulted in his opinion of market rent of $16.50 per square foot, which included market rent of $13.50 per square and $3.00 per square foot of tenant improvements.

Defendant's expert identified seven comparable leases for tax year 2010. The rents in those leases ranged from $17.75 per square foot to $18.75 per square foot. He made no adjustments to the rents and opined a market rent of $18.25 per square foot, plus tenant electric of $2.00 per square foot. He included tenant electric because he held the opinion that although the leases in a multi-tenant office building are likely to be gross leases, tenants are likely to be responsible for the cost of electricity. Notably, four of the comparable leases on which he relied, and to which he made no time adjustment, were executed prior to the well-documented 2008 financial crisis.

He took a similar approach with respect to tax year 2011, relying on five comparable leases with rents ranging from $17.00 per square foot to $19.59 per square foot. Again, he made no

11

adjustments to the rents and opined market rent of $18.00 per square foot, plus tenant electric. For tax year 2012, the expert's consideration of five comparable leases with rents ranging from $16.07 to $19.59, resulted in his opinion of market rent of $17.75, plus tenant electric. He made no adjustments to those leases. On cross-examination, defendant's expert could not explain how he arrived at his opinions of market rent, admitting to having set forth no explanation of his analysis of the leases in his report or elsewhere.[3]

The court concludes that the market rents offered by plaintiff's expert are credible and supported by market data. The court adopts the market rents he opined.[4]

    2.       Building Size.

As noted above, the parties offered conflicting testimony with respect to the rentable space at the subject property. The court concludes that plaintiff's expert offered a credible analysis of the subject property's rentable area after having inspected the property and the rent rolls.

    3.       Vacancy and Collection Rate.

A determination of value under the income-capitalization approach must include "a vacancy and loss allowance over the economic life of the property, using, in some measure, the actual history, but placing more emphasis on the trends in the most recent years." First Republic

---

[3] Defendant's expert also opined a small amount of rent for two utilities closets at the subject property, which appeared on the rent rolls. Because the court adopts the opinion of rentable square feet offered by plaintiff's expert and applies his opinions of market rent to the entire rentable square feet at the subject property, the court concludes that any income from the utilities closets has been accounted for in the court's analysis.

[4] The court was not persuaded by defendant's attempt during cross-examination to undermine the credibility of plaintiff's expert by referring to two reports the expert prepared for Capital One Bank valuing the subject property. Those reports valued the leased fee interest in the property, not its true market value. See Int'l Flavors & Fragrances, 21 N.J. Tax at 423. In addition, in those reports plaintiff's expert used a discounted cash flow analysis, not the income-capitalization approach applicable in the context of a local property tax appeal concerning an office rental building.

Corp. of Am. v. Borough of E. Newark, 16 N.J. Tax 568, 580 (Tax 1997), aff'd, 17 N.J. Tax 531 (App. Div. 1998). "The important principle implicated in the estimate of a vacancy and loss allowance is that the estimate is simply the appraiser's informed judgment of the long-term quality and durability of the income stream." Ibid. As Judge Crabtree explained:

> [The] determination involves more than uncritical acceptance of the vacancy rates prevailing in the subject on the valuation dates or, for that matter, the office building vacancy rates prevailing in the subject's market area. Rather, a vacancy allowance must be predicated on an estimate of the long-term quality and durability of the rental income stream.
>
> [Univ. Plaza Realty Corp. v. City of Hackensack, 12 N.J. Tax 354, 369 (Tax 1992), aff'd, 264 N.J. Super. 353 (App. Div. 1993).]

Plaintiff's expert engaged in a careful examination of vacancy data before opining a twenty percent vacancy rate for each tax year. He reviewed real estate surveys that are widely accepted in the industry and commonly used by appraisers. Those services indicated a bleak picture for the office rental market in Franklin Township for the third quarter of 2009. The northern New Jersey office market was experiencing a vacancy rate of 13.7%. The Brunswick, Piscataway I287 office market, a subset of the northern New Jersey office market, had a vacancy rate of 17.2%. The I287 office submarket, in which the subject property is located, was experiencing a 21.1% vacancy rate. Class A office space in the I287 submarket was vacant at a rate of 27.8%. The Franklin Township office market had a vacancy rate of 32.7% in the third quarter of 2009. From the third quarter of 2000 through the third quarter of 2009, the vacancy rate in the Weston Canal Road subcategory of the Franklin Township office market, in which the subject property is located, averaged 29%. The vacancy rates did not improve for the third quarter 2010 or the third quarter 2011.

Plaintiff's expert credibly testified that the subject property is located in "one of the most over supplied office markets in northern/central New Jersey" and that the area "has been hit harder

13

than other New Jersey office markets as rental rates in and around [Franklin Township] have significantly deteriorated and vacancy rates have significantly increased." In addition, he demonstrated that the vacancy rates grew as one examined areas more concentrated and closer to the subject property.

Defendant's expert, on the other hand, conceded that his proffered vacancy and collection rate of 7.5% for tax year 2010 and 10% for tax years 2011 and 2012 were based on his personal judgment, unsupported by market data. Although the expert acknowledged that the Franklin Township office rental market was weak on the valuation dates, he provided no analysis of vacancy rates in the township or how he calculated the increase in his proffered vacancy rate from tax year 2010 to tax years 2011 and 2012. He also testified that although he was aware of several professional services that provide office vacancy rate data, he did not consult those sources prior to opining on the vacancy rate for the subject property.

The court finds that the vacancy and collection rate offered by plaintiff's expert is credible. The expert undertook a detailed study of relevant data for the region, the general area, and the neighborhood in which the subject property is located. In each instance, as the data was more precisely focused on the subject property's location, the vacancy rate increased. The high vacancy rate is not reflective of an anomaly in the market, but a steady erosion, linked to both a downturn in the economy and the desirability of subject's neighborhood, as compared to more attractive locations in Franklin Township. In the absence of any meaningful analysis by defendant's expert, who, in effect, offered a net opinion, see Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011), the court adopts the vacancy and collection rates of plaintiff's expert.

The court acknowledges that vacancy and collection rates must reflect a stabilized rate and that an investor would expect to improve management of the subject property over time, given its

14

poor condition on the valuation dates. However, in light of the numerous deficiencies in the improvements at the subject property, the vast reduction in rented space on or near the valuation dates, the age of the buildings, and the competition the subject property faces from higher quality properties in Franklin Township, the court concludes that the vacancy and collection rates offered by plaintiff's expert are reasonable.

4.    Operating Expenses.

The court finds credible the operating expenses opined by plaintiff's expert. He examined the actual expenses incurred at the subject property and at two comparable Franklin Township office buildings. He also estimated a reserve for replacements, leasing commissions, and tenant work allowances. The expert's opinion on this point was well supported. Defendant's expert failed to consider tenant improvement expenses in his analysis, which the court considers to be critical flaw, given the likelihood that tenants would demand improvements to this poorly maintained property.

5.    Capitalization Rate.

The capitalization rate is an "income rate for a total real property interest that reflects the relationship between a single year's net operating income expectancy and the total property price or value . . . ." Appraisal Institute, The Appraisal of Real Estate (13th ed.) at 462. The capitalization rate is "used to convert net operating income into an indication of overall property value." Ibid.

Plaintiff's expert used both investor surveys and the Band of Investment technique to calculate an overall capitalization rate. The Bank of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding, 16 N.J. Tax at 80-81 (quoting Appraisal Institute, Appraisal of Real Estate 467 (10th ed. 1992)).

15

> Because most properties are purchased with debt and equity capital, the overall capitalization rate must satisfy the market return requirements of both investment positions. Lenders must anticipate receiving a competitive interest rate commensurate with the perceived risk of the investment or they will not make funds available. Lenders generally require that the loan principal be repaid through periodic amortization payments. Similarly, equity investors must anticipate receiving a competitive equity cash return commensurate with the perceived risk, or they will invest their funds elsewhere.
>
> [Appraisal Institute, Appraisal of Real Estate 505 (13th ed. 2008).]

In "using the Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Hull Junction Holding, 16 N.J. Tax at 82 (quoting Glen Wall Assocs. v. Twp. of Wall, 99 N.J. 265, 279-80 (1985)). "For these purposes, the Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Id. at 82-83. "Relevant data is also collected and published by . . . Korpacz Real Estate Investor Survey." Id. at 83. "By analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.

The experts opined similar capitalization rates. Plaintiff's expert testified that the appropriate capitalization rates were 10.5% for tax year 2010, 10.25% for tax year 2011, and 10% for tax year 2012. Defendant's expert opined capitalization rates of 10.1% for tax year 2010, 9.6% for tax year 2011, and 9.44% for tax year 2012. The court accepts as credible the capitalization rates offered by plaintiff's expert, which are supported by the market data on which he relied.

6.      Calculation of Value.

Having accepted the elements of plaintiff's expert's analysis under the income capitalization approach, the court also finds credible the values resulting from employing those elements in the standard formula for that approach:

| | |
|---|---|
| Tax year 2010 | $9,164,390 |
| Tax year 2011 | $7,562,987 |
| Tax year 2012 | $7,101,960 |

Plaintiff's expert, however, did not end his analysis there. He deducted from these values his estimate of the cost of necessary capital improvements at the subject property to address deferred maintenance. For tax years 2010 and 2011, he deducted $917,870 from his initial value conclusions. He deducted $859,600 for tax year 2012. The expert obtained those cost estimates from another expert as expressed in the property condition report admitted at trial. The court rejects this approach for two reasons. First, the expert who prepared the property condition report did not testify at trial. While it was appropriate for plaintiff's expert to rely on the property condition report, because the author of that report was not subject to direct and cross-examination, the court is unable to determine the credibility of his cost estimates. Plaintiff's expert gave no detailed testimony with respect to his verification of the cost estimates.

Second, the court is not convinced that a dollar for dollar deduction from the value reached under the income capitalization approach is the appropriate method to account for the cost of repairing damage from significant deferred maintenance. The costs might more appropriately be considered as long-term expenses stabilized over many years. In addition, the poor condition of the subject property is reflected in the market rent analysis, given that adjustments were made for the property's condition.

The court will, therefore, adopt the opinions of value of plaintiff's expert prior to the deduction for expenses to repair deferred maintenance. The court will round the figures as follows:

| | |
|---|---|
| Tax year 2010 | $9,164,000 |
| Tax year 2011 | $7,563,000 |
| Tax year 2012 | $7,102,000 |

D. Applying Chapter 123.

1. Tax Year 2010.

Because the municipality implemented a district-wide reassessment for tax years 2010, 2011, and 2012, the ratio analysis set forth in N.J.S.A. 54:51A-6(a), commonly known as Chapter 123, does not apply. N.J.S.A. 54:51A-6(d). The assessment on the subject property, therefore, will be set at 100% of value. A Judgment establishing the assessment for the subject property for tax year 2010 will be entered as follows:

| | |
|---|---|
| Land | $1,282,000 |
| Improvement | $7,882,000 |
| Total | $9,164,000 |

2. Tax Year 2011.

A Judgment establishing the assessment for the subject property for tax year 2011 will be entered as follows:

| | |
|---|---|
| Land | $1,058,600 |
| Improvement | $6,504,400 |
| Total | $7,563,000 |

3. Tax Year 2012.

A Judgment establishing the assessment for the subject property for tax year 2012 will be entered as follows:

| | |
|---|---|
| Land | $1,000,000 |
| Improvement | $6,102,000 |
| Total | $7,102,000 |